*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0349P (6th Cir.)
File Name: 03a0349p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

No. 02-5470

LEON BURKE,
*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 01-20191—Robert H. Cleland, District Judge.

Argued: August 6, 2003

Decided and Filed: October 1, 2003

Before: NORRIS, BATCHELDER, and ROGERS, Circuit
Judges.

---

## COUNSEL

**ARGUED:** J. Patten Brown III, OFFICE OF THE
FEDERAL PUBLIC DEFENDER FOR THE WESTERN
DISTRICT OF TENNESSEE, Memphis, Tennessee, for
Appellant. Frederick H. Godwin, ASSISTANT UNITED
STATES ATTORNEY, Memphis, Tennessee, for Appellee.
**ON BRIEF:** J. Patten Brown III, OFFICE OF THE

FEDERAL PUBLIC DEFENDER FOR THE WESTERN
DISTRICT OF TENNESSEE, Memphis, Tennessee, for
Appellant. Frederick H. Godwin, ASSISTANT UNITED
STATES ATTORNEY, Memphis, Tennessee, for Appellee.

---

## OPINION

---

ROGERS, Circuit Judge. Defendant-Appellant Leon Burke
pleaded guilty to being a felon in possession of a weapon, in
violation of 18 U.S.C. § 922(g). He now appeals the
judgment against him and his sentence, arguing that the
district court erred by conducting a suppression hearing via
video-conferencing, by applying a four-level sentencing
enhancement under United States Sentencing Guidelines
(USSG) § 2K2.1(b)(5) for possessing a firearm in connection
with another felony offense, and by applying a two-level
enhancement for obstruction of justice, under USSG § 3C1.1.
Finding no merit to his claims, we affirm.

### Facts

In September of 1996, Tennessee state officers were
investigating members of the Burke family, including two
brothers, Leon Burke ("Leon") and Billy Burke ("Billy").
Together the Burkes operated Burke's General Auto Repair
("Auto Shop") in Memphis. The officers suspected that they
were stealing cars, taking them to the Auto Shop, installing in
the stolen cars the vehicle identification number ("VIN")
plates from junked cars the Burkes purchased inexpensively
at Memphis Police Department ("MPD") salvage auctions,
and reselling the cars to innocent buyers. This process of
exchanging the VIN plates of wrecked cars for those of stolen
cars is known as "flipping."

The officers obtained a search warrant for the Auto Shop,
located at 3338 Weaver Road, and for the adjacent house that

Leon and Billy lived in, at 3340 Weaver Road. Inside the house they found various items that incriminated the brothers. Stowed between a refrigerator and the wall was an SKS Norinco 7.62 x 39 millimeter military assault rifle, with a 30-round banana clip magazine that held six live rounds. In a metal wall-locker in a bedroom they found a fully loaded .44 magnum Astra revolver, an unloaded Browning .22 caliber rifle, and a 12-gauge Mossberg pump shotgun that contained six live rounds in the magazine and one spent round in the chamber. The shotgun was noteworthy because, like a police assault shotgun, its shoulder-stock had been removed and a pistol grip added, so the gun could only be fired like a two-handed pistol. Also in the metal locker were four VIN plates, an envelope that said "84 Olds" and had "Leon Burke" stamped on a corner and contained a fifth VIN plate, ten applications for certificates of title, and other documents having to do with vehicle titles. Elsewhere in the house they found a book explaining how to modify certain guns to make them fully automatic, and another book describing how to make functional silencers. Behind the house, in a trailer, the officers found four more firearms. And scattered around the property were pieces of cars and stripped car bodies, some of which were pierced with bullet holes.

Four days after the search, Sergeant Farris McCarthy, the officer who had led the search, drove to the home of Jimmy Burke ("Jimmy"), another brother of Leon. McCarthy was interested in Jimmy because Jimmy held the title to a car bearing the VIN of a certain 1980 Chevrolet Impala that Leon had bought at a MPD auction, and McCarthy suspected that Jimmy's car was actually a stolen 1980 Impala into which Leon had installed the auctioned-car's VIN. McCarthy drove past Jimmy's house and saw the Impala in question parked out front, but instead of going in by himself he parked down the street and called for some uniformed officers to support him. When the uniformed officers arrived, however, the car was gone. The officers questioned Jimmy, who explained that he had bought the car from Leon, and that Leon had appeared at his house that morning and told him that he

should move the car somewhere else because police were trying to track down all cars bearing the VINs of cars Leon had bought at MPD auctions. Jimmy also told the officers where he and Leon had parked the car, and there they found it—stolen and with the VIN flipped, as expected.

The following year, Tennessee convicted Leon of theft of property worth over $500, and he was sentenced to two three-year sentences, to run concurrently. Leon served his sentence and was released. Federal authorities then indicted Leon for being a felon in possession of a weapon, and both Leon and Billy for conspiring to tamper with VIN numbers and steal cars, and for actually tampering with VINs on several occasions in violation of 18 U.S.C. § 511(a).

After the federal proceedings commenced, Leon (hereinafter "Burke") filed a motion to suppress the evidence seized at his house, arguing that the search had been unconstitutional for various reasons. A hearing was scheduled, but because there was a severe shortage of judges in the Western District of Tennessee just then, it was arranged that Judge Robert Cleland of the Eastern District of Michigan would hear the case as a visiting judge. Prior to the hearing, Judge Cleland notified the parties that he would be presiding over the case from Michigan, participating in the proceedings via live two-way video, with a two-way audio feed so he could hear the parties and also talk to them, and everything else would be normal, with the parties and witnesses together in the court room in Memphis. Burke's counsel did not object until the hearing itself was underway, at which time he argued that the use of video violated what was then Rule 26 of the Federal Rules of Criminal Procedure, which provides that "[i]n all trials the testimony of witnesses shall be taken orally in open court." After discussing the objection, Judge Cleland denied it, and went on to deny the motion to suppress as well.

Burke thereafter entered into a Rule 11 plea agreement under which he agreed to plead guilty to the felon in possession charge, and the government agreed to drop the

other charges against him. The agreement additionally provided that Burke could appeal the adverse suppression finding.

Judge Cleland held a sentencing hearing, in person this time. He applied a four-level enhancement pursuant to USSG § 2K2.1(b)(5) for possessing a firearm in connection with another felony (*i.e.*, in connection with VIN flipping), a two-level enhancement pursuant to USSG § 3C1.1 for obstructing justice by telling Jimmy to move his car, and a three-level reduction for accepting responsibility, but he denied Burke's request for a downward departure. In the end, he sentenced Burke to the bottom of the Guidelines range: 78 months, plus three years of supervised release. Burke now appeals.

**Analysis**

**I. The Propriety of Holding the Suppression Hearing Via Video-Conference**

Burke argues that the judgment in this case should be reversed and the case remanded for resentencing because the district court's use of video-conferencing violated Rules 26 and 43 of the Federal Rules of Criminal Procedure, and because it violated constitutional due process. The arguments are without merit.

At the outset, we note that at Burke's video-conferenced suppression hearing, his counsel objected solely on the basis of Rule 26, and he did not mention Rule 43 or the Constitution. Consequently, we review his Rule 43 and constitutional arguments only for plain error. *See* Rule 52(b); *United States v. Crouch*, 288 F.3d 907, 909 (6th Cir. 2002). To prevail on these claims, Burke must show "(1) that an error occurred in the district court; (2) that the error was plain, *i.e.*, obvious or clear; (3) that the error affected his substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of his suppression hearing." *United States v. Koeberlein*, 161 F.3d 946, 949 (6th

Cir. 1998). In evaluating Burke's Rule 26 claim, which he did timely raise, we review the district court *de novo*, because the claim concerns a matter of law. *See United States v. Roman-Zarate*, 115 F.3d 778, 781 (10th Cir. 1997) ("Interpretation of the Federal Rules of Criminal Procedure is a legal issue subject to de novo review.").

**A. Rule 43**

We begin our analysis with Rule 43, because this is where Burke concentrates his argument on appeal, and because it is under this rule that most cases involving video-conferencing have arisen. At the time of Burke's hearing, Rule 43(a) provided that "[t]he defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule."[1] Burke's argument fails because the rule does not extend to pre-trial motions.

Four Courts of Appeals have held that video-conferencing in the context of a proceeding that is covered by Rule 43 does not satisfy the rule's requirement that the defendant be "present." *See United States v. Torres-Palma*, 290 F.3d 1244, 1248 (10th Cir. 2002) (holding that video-conferencing at sentencing violated Rule 43); *United States v. Lawrence*, 248 F.3d 300, 303–04 (4th Cir. 2001) (same); *United States v. Navarro*, 169 F.3d 228, 235–39 (5th Cir. 1999) (same); *Valenzuela-Gonzalez v. United States Dist. Court for Dist. of*

---

[1]This version of Rule 43 was revised in December 2002, when the Advisory Committee changed the rules to provide explicitly for video-conferencing in initial appearances and arraignments. *See* Rule 5(f) (2003) (providing that for initial appearances, "[v]ideo teleconferencing may be used to conduct an appearance under this rule if the defendant consents"); Rule 10(c) (2003) ("Video teleconferencing may be used to arraign a defendant if the defendant consents."); Rule 43(a) (2003) ("Unless . . . Rule 5, or Rule 10 provides otherwise, the defendant must be present . . . .").

*Ariz.*, 915 F.2d 1276, 1280 (9th Cir. 1990) (finding a violation where video-conferencing was used in an arraignment, based on a combination of Rule 10's requirement that arraignments be held in "open court" and Rule 43's requirement that the defendant be "present"). *But see Navarro,* 169 F.3d at 240–41 (Politz, J., dissenting) (arguing that Rule 43 permits sentencing by video-conference).[2]

But Rule 43 does not apply to Burke's suppression hearing. By its text, the rule applies through "every stage of the trial" beginning with the impaneling of the jury, and it applies to only two pre-trial events—the arraignment and the plea. Consequently, the only way Burke's pre-trial suppression

---

[2]These decisions rely primarily upon the plain, common-sense, dictionary meaning of "present" as "physical existence in the same place as whatever act is done there." *Navarro,* 169 F.3d at 236; *see also Torres-Palma,* 290 F.3d at 1247 (agreeing with *Navarro*'s analysis); *Lawrence,* 248 F.3d at 303 ("[D]ictionaries confirm that presence means physical presence."); *Valenzuela-Gonzalez,* 915 F.2d at 1281 ("[W]e hold that the plain language of the rules must be followed."). These decisions have also relied on four other factors to support their interpretation: (1) the Confrontation Clause generally requires that a defendant be able physically to confront the witnesses against him, and Rule 43's protections—more extensive than those of the Confrontation Clause—are nonetheless given context by that Clause, *see Navarro,* 169 F.3d at 236–37; (2) Rule 43(b)(3) notes that the defendant can be physically excluded from "the courtroom" for being disruptive, and for this to happen it must be the case that the defendant initially had the right to be physically present in "the courtroom," *see id.; Lawrence,* 248 F.3d at 303–04; (3) various passages from the Advisory Committee Notes to Rule 43 evidence that "presence" means "physical presence," *see Navarro,* 169 F.3d at 237–39; and (4) television is not the same thing as physical presence, *see Lawrence,* 248 F.3d at 304 ("[V]irtual reality is rarely a substitute for actual presence and . . . even in an age of advancing technology, watching an event on the screen remains less than the complete equivalent of actually attending it."). In contrast, Judge Politz, dissenting on this point in *Navarro,* argues that "present" for Rule 43 purposes should be given the alternative dictionary meaning of "within sight or call" and that such a definition would "giv[e] appropriate effect to the clear intent of Rule 2 . . . directing us to construe the Rules so as to eliminate unjustifiable expense and delay[.]" 169 F.3d at 240.

---

hearing could be covered by Rule 43 is if the hearing somehow qualified as a "stage of the trial."[3]

The background of Rule 43 makes it clear that a pre-trial motion hearing is not a "stage of the trial." The Advisory Committee Notes to the 1944 adoption of Rule 43 explained that "[t]he first sentence of the rule setting forth the necessity of the defendant's presence at arraignment and trial is a restatement of existing law." Rule 43, 1944 Advisory Committee Notes, ¶1 (citing *Lewis v. United States,* 146 U.S. 370 (1892), and *Diaz v. United States,* 223 U.S. 442 (1912)). The Notes added, next, that "[t]his principle does not apply to hearings on motions made *prior to* or after trial." *Id.* (emphasis added) (citing *United States v. Lynch,* 132 F.2d 111 (2d Cir. 1942)).

An investigation into this "existing law" that the rule codified reveals, predictably enough, that "trial" denoted the time between the impaneling of the jury and the delivery of the sentence. For example, in the *Lewis* case cited in the

---

[3]Burke's counsel argues that under Rule 43, a defendant has the right to be present not only at "every stage of the trial," as Rule 43 provides, but also at every "critical stage" of the judicial proceedings taken as a whole. Support for this conclusion is found in dictum in *United States v. Johnson,* 859 F.2d 1289 (7th Cir. 1988). In *Johnson,* which was a Rule 43 case challenging the defendant's absence from a suppression hearing, the court noted that "[t]he parties do not dispute that an accused person has a right to be present at every critical stage of a criminal proceeding against him and that a pretrial suppression hearing is a critical stage." *Id.* at 1294. The court, then, assumed that the suppression hearing was a part of the "trial" for purposes of Rule 43, because it was a "critical stage," but went on to hold that the exception to Rule 43 for a " conference or argument upon a question of law" applied. *Id.* at 1294–95. We disagree with the "critical stage" dictum, however. Though the right to have counsel present depends upon whether a judicial proceeding is a "critical stage," *see, e.g., Coleman v. Alabama,* 399 U.S. 1, 7 (1970), this standard does not apply to Rule 43 because Rule 43 sets out its own, different, standard: the defendant has the right to be present at "every stage of the trial." Further, we know of no other Rule 43 cases that employ the "critical stage" standard.

Notes, the Supreme Court reversed a death sentence for murder where the defendant had not been allowed to be present in court during preliminary challenges to the jury. *See* 146 U.S. at 372–73. The Court relied upon and quoted from *Hopt v. Utah*, 110 U.S. 574 (1884), which rejected a government argument that the trial did not begin until the jury was sworn in, and which instead held that "where the indictment is for a felony, the trial commences at least from the time when the work of empanelling the jury begins." *Hopt*, 110 U.S. at 578; *see also Lewis*, 146 U.S. at 373-74. The *Lewis* case, then, which Rule 43 was built upon, supported the proposition that the "trial" begins with jury impaneling. This proposition is strengthened by the other cases that the Notes cite.[4]

Cases handed down since the enactment of Rule 43 have typically construed the word "trial" in a similarly restrictive fashion.[5] Though none of the cases cited so far dealt with

---

[4] *See Diaz*, 223 U.S. at 455 ("In cases of felony our courts, with substantial accord, have regarded [the defendant's right to be present] as extending to *every stage of the trial, inclusive of the empaneling of the jury and the reception of the verdict*, and as being scarcely less important to the accused than the right of trial itself." (emphasis added)); *Lynch*, 132 F.2d at 113 ("We do not understand that the right of a defendant to be present in court throughout his trial has ever been considered to embrace a right to be present also at the argument of motions prior to trial or subsequent to verdict."); *see also Snyder v. Massachusetts*, 291 U.S. 97, 107 (1934) (noting "the distinction everywhere drawn between proceedings at the trial and those before and after," and observing that "[m]any motions before trial are heard in the defendant's absence, and many motions after trial or in the prosecution of appeals") (overruled on other grounds, *Malloy v. Hogan*, 378 U.S. 1 (1964)). *See generally Crosby v. United States*, 506 U.S. 255, 259 (1993) (discussing the law that Rule 43 was meant to restate).

[5] *See, e.g., United States v. Bradford*, 237 F.3d 1306, 1309–10 (11th Cir. 2001) (noting that "every other circuit to address the issue" has "held that a trial commences under Rule 43 when jury selection begins," and stating that "[a]fter reviewing this precedent from other circuits, we find their reasoning compelling and conclude that, for purposes of Rule

---

proceedings held before the jury was impaneled, courts considering such circumstances have consistently held that a defendant's absence does not violate Rule 43.[6] This is true even with respect to post-trial evidentiary hearings—in proceedings, that is, where the Rule 43(c)(3) exception for "when the proceeding involves only a conference or hearing upon a question of law" did not apply.[7]

Overall, the authorities are nearly unanimous that Rule 43's right to be present does not apply to pre-trial suppression

---

43(b)(1) [the exception for a defendant's voluntary absence after 'trial has commenced'], a 'trial has commenced' when the jury selection process has begun"); *United States v. Krout*, 56 F.3d 643, 646 (5th Cir. 1995) (finding for the same purpose that trial begins with jury selection and noting that "our research[] does not reveal a contrary interpretation of the Rule"); *see also Gannett Co. v. DePasquale*, 443 U.S. 368, 394 (1979) (Burger, C.J., concurring) ("By definition, a hearing on a motion before trial to suppress evidence is not a trial; it is a pretrial hearing.") (emphasis omitted).

[6] *See, e.g., United States v. Pepe*, 747 F.2d 632, 653 (11th Cir. 1984) ("The first advisory committee note shows clearly that proceedings such as [pretrial hearings to determine the admissibility of the evidence the government intends to offer at trial] do not fall into the Rule 43 catch-all, 'every stage of the trial.'"); *Taylor v. United States*, 385 U.S. 835, 836 (8th Cir. 1967) (in which the defendant complained that Rule 43 had been violated because he had not been present at several preliminary motions disposed of prior to commencement of trial, and the court responded that "it is doubtful whether such motions constitute a part of defendant's trial").

[7] *See, e.g., United States v. Boyd*, 131 F.3d 951, 953 n.3 (11th Cir. 1997) ("It is clear that Rule 43 did not entitle Boyd to attend the [post-trial] evidentiary hearing: The rule does not mention post-trial proceedings, and in fact the Advisory Committee's note to the original enactment notes that the principle behind the rule 'does not apply to hearings on motions made prior to or after trial.'"); *United States v. Gradsky*, 434 F.2d 880, 882 (5th Cir. 1970) ("The Sixth Amendment and Fed.Rules Cr.Proc. 43 do guarantee a defendant the right to be present at the arraignment and 'at every stage of the trial.' No appellate court has extended this right to an evidentiary hearing.").

hearings.[8] Consequently, we conclude that Burke did not enjoy Rule 43's right to be "present," and his Rule 43 challenge to the use of video-conferencing at those proceedings must fail. In light of this conclusion, it is unnecessary to proceed to harmless-error review, which would otherwise be the next step. *See, e.g., United States v. Harris*, 9 F.3d 493, 499 (6th Cir. 1993) ("As we previously have held, the rule requiring a defendant's presence at every stage of the trial must be considered with Rule 52(a) of the Federal Rules of Criminal Procedure, [which provides] that harmless error is to be disregarded.").

**B. Rule 26**

Rule 26 provides that "[i]n all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided[.]" We reject Burke's contention that this rule applied to his suppression hearing, and that the use of video-conferencing violated the rule's "open court" requirement.

Though Burke discussed Rule 26 at the suppression hearing, on appeal he refers to Rule 26 only in his Summary of Argument, and then only in a conclusory fashion. *See* Burke Br. at 16 ("The defendant was not 'present' in 'open court' because the district court was absent from the courtroom."). We find, then, that he has forfeited this ground. *See Smoot v. United Transp. Union*, 246 F.3d 633, 647 (6th

Cir. 2001) ("This Court deems issues presented in a perfunctory manner on appeal to have been waived.").

Even if Burke had not forfeited this argument, we would reject it on the merits. The only support for Burke's contention that the term "open court" precludes video-conferencing is found in the Ninth Circuit's *Valenzuela-Gonzalez* case, in which the court partially based its no-video-arraignment holding on Rule 10's provision that "[a]rraignment shall be conducted in *open court*." 915 F.2d at 1280 (emphasis added). There is no need for us to consider the persuasiveness of this reasoning, however, because Rule 26, like Rule 43, applies by its terms to "trials," and Burke's suppression hearing was a pre-trial proceeding.

**C. Constitutional Arguments**

The use of video-conferencing at Burke's suppression hearing, moreover, did not violate Burke's fair trial right to have the judge "present." Nor did it violate Burke's constitutional right to be "present" himself at trial. We will consider these arguments in turn.

Burke relies upon his constitutional right to "have all critical stages of a criminal trial conducted by a person with jurisdiction to preside." *Gomez v. United States*, 490 U.S. 858, 876 1989) (invalidating a magistrate's conduct of jury selection on statutory grounds and reversing the conviction for that structural error). Burke analogizes his situation to that in *United States v. Mortimer*, 161 F.3d 240 (3d Cir. 1998), in which the judge was unaccountably absent during counsel's summation and unable to consider an objection by opposing counsel. *Id.* at 241. The Third Circuit found that this was a structural error, reasoning that "[a] trial consists of a contest between litigants before a judge. When the judge is absent at a 'critical stage' the forum is destroyed." *Id.*

It is true that courts have held that a judge's actual absence from certain phases of the trial can constitute a structural

---

[8]Interestingly, the Wright & Miller treatise disagrees with this conclusion, suggesting that Rule 43 should apply in such circumstances despite the Advisory Committee's 1944 note. *See* 3A WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 721.1; *see also United States v. Dalli*, 424 F.2d 45, 48 (2d Cir. 1970) (dictum citing Wright & Miller for the proposition that "a defendant has a right to be present at a suppression hearing where testimony is to be taken," but finding that the defendant had waived this right). But the Wright & Miller treatise does not justify its conclusion, except to state that "it would seem that defendant has a right to be present," and it cites no federal cases besides *Dalli* that adopt such a holding.

error, depriving a defendant of the right to a fair trial. But Burke has failed to cite any cases establishing that this right is violated where the judge is present through video-conferencing, nor do we know of any. Indeed, *United States v. Kone*, 307 F.3d 430 (6th Cir. 2002), a somewhat more closely analogous case that involved the use of a speakerphone, suggests that there was no violation in this case. In *Kone* the trial judge needed to leave immediately for a judicial conference, so he arranged for another federal judge, in a different city, to handle jury questions that might arise during deliberations and to receive the verdict and poll the jurors via speakerphone. *See id.* at 441–42. Relying upon a series of Second Circuit cases, this court distinguished *Mortimer* and found no structural error, holding that "[t]his is not the case of a judge who completely abdicated his judicial responsibilities, as in *Mortimer*, but rather the case of a judge who presided telephonically at important stages of the trial." *Id.* at 443.

Furthermore, whatever right Burke had to the presence of the judge, this right is implicated to a lesser degree in a suppression hearing than it is in an actual trial. *See, e.g., United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("[T]he process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself."). In this case the judge could see, hear, and speak to the witnesses, and they could see, hear, and speak to him. Though presence through a television is not the same thing as direct physical presence, in this case the difference between the two was not of constitutional dimension. The judge's presence via video-conferencing did not deprive Burke of due process by rendering his suppression hearing fundamentally unfair, and it did not constitute a structural error.

Burke's companion argument that the Constitution requires the *defendant* to be present is largely based on the Sixth Amendment Confrontation Clause, which guarantees that the accused has the right "to be confronted with the witnesses

against him." *See United States v. Gagnon*, 470 U.S. 522, 526 (1985) ("The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment[.]"). Of the various elements to the confrontation right—"physical presence, oath, cross-examination, and observation of demeanor by the trier of fact"—physical presence, or a defendant's right to confront the witnesses against him face-to-face, forms "the core of the values furthered" by the Clause. *Maryland v. Craig*, 497 U.S. 836, 846–47 (1990); *see also Coy v. Iowa*, 487 U.S. 1012, 1016 (1988) (finding a violation of the right to confront witnesses where a screen was placed between the defendant and two child witnesses in a child abuse case). But the physical confrontation right is not absolute, and alternatives such as video-confrontation may be acceptable where "necessary to further an important policy." *See Craig*, 497 U.S. at 852 (holding that "use of [a] one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause"); *see also United States v. Bell*, 464 F.2d 667, 672 (2d Cir. 1972) (finding no Confrontation Clause violation where a defendant was excluded from part of his suppression hearing while a certain witness testified, a witness whose testimony the government wanted to keep secret). Further, the Supreme Court has repeatedly explained that "[t]he right to confrontation is basically a trial right." *Barber v. Page*, 390 U.S. 719, 725 (1968); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 52-53 (1987) (plurality opinion); *California v. Green*, 399 U.S. 149, 157 (1970).

In this case, even ignoring the fact that the video-conferencing was at a suppression hearing rather than during a trial, Burke's right to confront the witnesses against him physically was not implicated. Unlike in cases where *the defendant* is present only via video-conferencing, Burke was in the courtroom, physically facing the witnesses, and it was only the judge who was remote.

The other constitutional foundation of the right of defendant to be present is the Fifth Amendment Due Process clause, and the Supreme Court has held that this clause guarantees "that a defendant be allowed to be present 'to the extent that a fair and just hearing would be thwarted by his absence[.]'" *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934)); *see also id.* at 745–46 (holding that due process guarantees were not violated where a defendant was excluded from a witness competency hearing, and noting that the hearing did not concern the witnesses' substantive testimony); *Gagnon*, 470 U.S. at 526 ("[W]e have recognized that [the] right [to be present] is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him."); *United States v. Brown*, 571 F.2d 980, 986 (6th Cir. 1978) ("The Constitution only grants to the criminal defendant the 'right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings[.]'" (quoting *Faretta v. California*, 422 U.S. 806, 819 n. 15 (1975))). Here again, however, the Court has held that "the process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself." *Raddatz*, 447 U.S. at 679.

It is questionable whether Burke's right to a fair and just hearing would have been thwarted even had he been entirely excluded from his suppression hearing. *See, e.g., Yates v. United States*, 418 F.2d 1228, 1229 (6th Cir. 1969) ("It is . . . claimed that the appellant's constitutional rights were violated because he was excluded from the hearing to suppress evidence. We find no merit to this claim."). Given that Burke *was* physically present at the hearing, and it was only the judge who was in any sense "absent," Burke's Fifth Amendment right to be present was not violated. On this constitutional ground, as in the other constitutional arguments Burke asserts, the district court committed no error, let alone plain error.

## II. The USSG § 2K2(b)(5) Enhancement for Use of A Firearm in Connection With Another Felony Offense

We review for clear error the district court's factual findings, and accord "due deference" to the district court's determination that the USSG § 2K2.1(b)(5) enhancement applies. *See* 18 U.S.C. § 3742(e); *United States v. Ennenga*, 263 F.3d 499, 502 (6th Cir. 2001). Section 2K2.1(b)(5) instructs a court to increase a defendant's felony offense by four levels "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense[.]" A court can apply this enhancement "only . . . if the Government establishes by a preponderance of the evidence that the defendant possessed or used a gun in connection with another felony." *United States v. Hardin*, 248 F.3d 489, 495 (6th Cir. 2001). The section "was created in response to a concern about the increased risk of violence when firearms are used or possessed during the commission of another felony." *United States v. McDonald*, 165 F.3d 1032, 1037 (6th Cir. 1999) (emphasis omitted).

In this case, the district court did not err in applying this enhancement. The court found a sufficient connection between the guns in Burke's house and the VIN-flipping operation based on a number of factors: Burke was running the VIN-flipping operation from the Auto Shop, which was located just across the driveway from the house; three of the guns were found in the same metal cabinet that held detached VIN numbers and other VIN-flipping evidence; the metal cabinet was kept in the master bedroom, and people who have significant contraband tend to keep such things in their bedrooms; Burke's VIN-flipping business appears to have been his chief source of income during this time; some of the weapons were loaded, and one had been discharged; and the Mossberg shotgun had been modified to make it more like an assault weapon. On the basis of this evidence, the judge concluded that "[i]t is abundantly clear to me far beyond any preponderance of the evidence that these firearms were

possessed in connection with another felony offense, specifically, auto theft and VIN-flipping[.]"

In making its finding, the judge also found that the "fortress theory" applied at least to some extent, even though no drugs were involved here. This theory originated in cases involving 18 U.S.C. § 924(c)(1), which provision penalizes anyone who, "during and in relation to any crime of violence or drug trafficking crime[,] . . . uses or carries a firearm." The theory was a means for courts to find that a defendant "used" a firearm, even where there was no evidence that the defendant had fired, brandished, or even picked up the weapon. *See United States v. Grant*, 545 F.2d 1309, 1312 (2d Cir. 1976) (finding "use," based on the fact that the social club that housed the defendants' drug operation was a "veritable fortress"); *see also United States v. Henry*, 878 F.2d 937, 944 (6th Cir. 1989) ("[I]f it reasonably appears that the firearms found on the premises controlled or owned by a defendant and in his actual or constructive possession are to be used to protect the drugs or otherwise facilitate a drug transaction, then such firearms are used 'during and in relation to' a drug trafficking crime." (quoting 18 U.S.C. § 924(c)(1))). Though the Supreme Court has curtailed the theory in relation to § 924(c)(1) by holding that the term "use" in § 924(c)(1) means "active employment" and not merely possession, *see Bailey v. United States*, 516 U.S. 137, 150 (1995), the theory is still applicable in § 2K2.1(b)(5) cases because the latter provision contains the additional word "possessed." *See United States v. Covert*, 117 F.3d 940, 947–48 (6th Cir. 1997) (holding that the theory continues to apply under § 2K2.1(b)(5) post-*Bailey*).

A difficulty in applying the theory in the present case is that it normally comes into play where drugs are involved, and there were no drugs here. Burke argues that this difficulty means that the theory is inoperative, and the enhancement was therefore improper. The government argues that the theory should be extended into non-drug cases. In our opinion, however, the more sensible course is to forgo any

reliance on the theory in this case and adhere to the text of § 2K2.1(b)(5), simply asking whether the government met its burden of showing that "the defendant . . . possessed any firearm or ammunition in connection with another felony offense," and remembering that possession can be actual or constructive. *See Covert*, 117 F.3d at 948. The fortress theory played a role in relation to § 924(c)(1) because in that context there was a leap to be made: using a weapon is different from merely possessing one, and the theory permitted courts to infer use from possession. But the theory is less useful where § 2K2.1(b)(5) is concerned, because § 2K2.1(b)(5) already says "possession," and there is no leap to be made; rather, the government must merely establish a factual connection by a preponderance of the evidence. Further, in the present case the theory has only introduced confusion, inciting the parties to argue about the meaning and extension of the theory, and diverting attention from the real question, whether § 2K2.1(b)(5) itself has been satisfied.

Based on the above-noted evidence relied upon by the district court, we find that the court did not clearly err in concluding that Burke's possession of the various firearms in his house was connected with his VIN-flipping operation. Unlike where drugs are involved, there is no widely acknowledged consensus that VIN-flipping is a dangerous activity that frequently involves guns. Nevertheless, the guns and the VIN paraphernalia were found in close proximity, the illegal operation could have been protected by guns (*e.g.*, to fend off disgruntled car buyers, to deter thieves, and to defend the operation from the police), and overall there was sufficient evidence for the district court reasonably to conclude that the guns and the operation were connected.

### III. The USSG § 3C1.1 Enhancement for Obstruction of Justice

We also uphold the district court's sentencing enhancement for obstruction of justice, based on Burke's having told Jimmy to move a car so that the police would not find

evidence of VIN-flipping.  Insofar as the district court made factual determinations in finding that the USSG § 3C1.1 enhancement applied to Burke, we review for clear error.  *See United States v. Jackson-Randolph*, 282 F.3d 369, 390 (6th Cir. 2002).  Insofar as the court's interpretation of the Guidelines was purely legal, we review *de novo*.  *See United States v. Canestraro*, 282 F.3d 427, 431 (6th Cir. 2002).

Though § 3C1.1was substantially amended in 1998, the pre-amendment version of the guideline applied at Burke's sentencing.  It provided that "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." USSG § 3C1.1 (1995); *see also id.*, cmt. n.3 (listing, as an example of obstructive conduct, "procuring another person to . . . conceal evidence that is material to an official investigation or judicial proceeding").  In the 1990s, a circuit split developed over whether "instant offense" referred to obstruction in both the defendant's case and in other cases closely related to the defendant's case—so that the enhancement would apply if the defendant obstructed justice in a co-defendant's case, *see, e.g., United States v. Acuna*, 9 F.3d 1442, 1446 (9th Cir. 1993)—or whether "instant offense" meant "offense of conviction," so that the enhancement would apply only where the obstruction specifically related to the offense for which the defendant was convicted. The Sentencing Commission in 1998 resolved the split in favor of the former position.[9]  *See* USSG Supp. to

---

[9]The present version provides that

[i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Appendix C, Amend. 581 (setting out the amendment, and explaining the rationale).  Prior to that time, however, the circuits adopted one position or the other.

This court has tipped its hat to both sides of the split.  In *United States v. Horry*, 49 F.3d 1178 (6th Cir. 1995), we held that the term "instant offense" in § 3C1.1 required that "the obstruction must occur solely with respect to the offense of conviction."  *Id.* at 1180–81.  Subsequently, however, in *United States v. Nesbitt*, 90 F.3d 164 (6th Cir. 1996), we held that the enhancement could be upheld if the evidence of obstruction of justice is "sufficiently related" to the offense of conviction.[10]

In *Nesbitt*, the defendant had been convicted of money laundering for using drug proceeds to purchase a Mercedes Benz and having it titled in the name of his girlfriend.  *Id.* at 168.  In a related charge that was dropped pursuant to a plea

---

USSG § 3C1.1 (2002).

[10]*Horry* was also limited in *United States v. Walker*, 119 F.3d 403 (6th Cir. 1997), a case that the Sentencing Commission would later cite as an example of the view adopted in the amended § 3C1.1.  *See* USSG Supp. to Appendix C, Amend. 581.  In *Walker* the defendant, Mr. Walker, was indicted along with a co-defendant for conspiring to distribute cocaine and for possessing a gun in connection with the conspiracy.  119 F.3d at 405.  When they were arrested they were together at Walker's apartment, with some drugs sitting on the table; Walker pointed a pistol at the officers and, in self-defense, they opened fire.  *Id.*  Walker survived, and after he pleaded guilty he falsely testified at his co-defendant's trial that the co-defendant had nothing to do with the drugs and that Walker had not pointed the gun at the police but instead had dropped it.  *Id.*  Walker received a § 3C1.1 enhancement on the basis of his perjured testimony, and on appeal he argued that his perjury could not have been during the "instant offense" because he did it after he had pleaded guilty.  *Id.* at 406.  We rejected this argument, holding that the enhancement can apply in a separate but related proceeding, and finding that it did apply because "defendant and codefendant were inextricably related in the criminal offenses charged against both."  *Id.* at 406–07.

bargain, the defendant was charged with using drug money to purchase a different Mercedes that he registered in his aunt's name.  *Id*.    The district court granted an obstruction enhancement, based on the defendant's alleged perjury (and his instructions to his aunt to commit perjury) at a civil forfeiture proceeding regarding the second Mercedes. *Id*. On appeal, the defendant argued that the district court had violated *Horry*, because the forfeiture proceeding in which he committed his obstructive conduct was not his "offense of conviction." *Id*. at 168–69. This court rejected his argument, and distinguished *Horry*:

> unlike the *Horry* case, [the defendant's] behavior in relation to the [dismissed] charge should not be viewed as collateral conduct irrelevant to the "instant offense." Instead, this conduct was related to the "instant offense" in that *it was intended to impede the same government investigation* that eventually resulted in [the defendant's] plea bargain and conviction.

*Id*. at 169 (emphasis added).

The district court in this case properly relied upon our holding in *Nesbitt*.[11]  Burke's action was intended to impede

---

[11] Burke also argues that a more recent pre-amendment case, *United States v. Koeberlein*, 161 F.3d 946 (6th Cir. 1998), reaffirmed *Horry*'s narrow "offense of conviction" requirement. In *Koeberlein* the defendant, Mr. Koeberlein, was convicted for stealing a rented front-end loader. 161 F.3d at 948. The district court applied the § 3C1.1 enhancement because Koeberlein—in incidents that happened prior to the front-end loader theft—had failed to appear in state court for prosecutions of similar thefts, and had evaded officers who were pursuing him for one of these thefts. *See id*. at 950–51. Koeberlein appealed, arguing that "although he had missed court dates related to state prosecutions, he did not fail to appear for any proceedings related to the instant offense, which is what the Sentencing Guideline's language contemplates." *Id*. at 951. We agreed, finding that the obstructive conduct had to have occurred no sooner than the investigation of the offense of conviction, and since Koeberlein's conduct had occurred prior to his front-end loader theft, the district court erred. *See* 161 F.3d at 951. Though in the course of this holding we

the same government investigation that eventually resulted in Burke's plea bargain and conviction. It was clearly related to the VIN-flipping charge that the government dropped against Burke as part of the plea bargain. It was, moreover, related to the VIN-flipping charge that Burke's co-defendant, his brother Billy, was convicted of.[12]

We recognize that the gun possession and VIN-flipping in this case are not as obviously related as the criminal money-laundering and civil forfeiture cases in *Nesbitt*. Indeed, the district court in this case indicated that it would take the marginal nature of the connection into account in determining where to sentence within the guidelines range. And we do not hold that proceedings resulting from the same government investigation will in all circumstances be related for purposes of applying the pre-amendment version of § 3C1.1. But here, as indicated in the previous section, the district court reasonably found a connection between the weapons and the VIN-flipping activity. The weapons charge grew directly out of the VIN-flipping investigation. The guilty plea on the weapons charge was based in part on dismissal of the VIN-

---

quoted *Horry*'s rule—that "the obstruction must occur solely with respect to the offense of conviction," *id*. (quoting *Horry*, 49 F.3d at 1180–81)—this did not mean that we were thereby changing the position we adopted in *Nesbitt* and *Walker*, that obstruction applies both to the offense of conviction and to related conduct. Rather, *Koeberlein* merely reaffirmed something that we had established prior to *Horry*, and that we reaffirmed in *Nesbitt*: that "related conduct" must be conduct that occurred "during the investigation, prosecution, and sentencing of the instant offense[.]" *Koeberlein*, 161 F.3d at 951 (quoting *United States v. Crousore*, 1 F.3d 382, 384 (6th Cir. 1993)); *see also Nesbitt*, 90 F.3d at 169. Consequently, *Koeberlein* does not make generally applicable the restrictive "offense of conviction" rule from *Horry* that subsequent cases limited. *See Walker*, 119 F.3d at 407 (distinguishing *Horry*, and holding that "this circuit has given a broad reading to the 'instant offense' language").

[12] This conclusion is supported by our decision in *Walker*. *See* footnote 10, *supra*.

flipping charge. And a co-defendant was convicted on a VIN-flipping charge. In the presence of these factors, the holding of *Nesbitt* permits our conclusion that the district court properly applied the obstruction enhancement.

## Conclusion

For the foregoing reasons, we AFFIRM the judgment and the sentence of the district court.